## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Bryan Del Villar, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. Your affiant has been employed by Homeland Security Investigations (HSI) as a Special Agent since January 2018. As part of becoming an HSI Special Agent, your affiant attended a six-month training academy at the Federal Law Enforcement Training Center in Glynco, Georgia, where he received extensive training in criminal investigations. Prior to his employment with HSI, your affiant was employed by U.S. Customs and Border Protection as a Border Patrol Agent in Nogales, Arizona, from 2010 to 2018. From 2013 to 2016, he served on the U.S. Border Patrol – Nogales Targeted Enforcement Unit, where he participated in and led numerous alien smuggling investigations. Additionally, your affiant was assigned to the Arizona High Intensity Drug Trafficking Area – Counter Narcotics Alliance from 2016 to 2018, where he conducted complex narcotics investigations. Your affiant has attained a Bachelor of Science in Business Administration and a Master of Business Administration from the University of Phoenix. Your affiant is currently assigned to the HSI Nogales Border Enforcement Security Task Force, where he has conducted several investigations in numerous programmatic areas, including weapons and bulk ammunition smuggling. Throughout his career, your affiant has been directly involved in numerous investigations resulting in successful prosecutions by the United States Attorney's Office.

2. This investigation involves suspected violations of 18 U.S.C. §§ 371, 554(a), and 922(a). Your affiant is familiar with 18 U.S.C. § 371, which states: if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

3. Your affiant is familiar with 18 U.S.C. § 554(a), which states: whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

4. Your affiant is familiar with 18 U.S.C. §922(a)(6), which states: it shall be unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition.

5.  Your affiant has consulted with other experienced investigators concerning the practices of firearms/ammunition traffickers and the best methods of investigating them. In preparing this Affidavit, your affiant has conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, your affiant has personal knowledge of the following facts or have learned them from the individuals involved in this investigation.

6.  Your affiant submits this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a Search Warrant authorizing the examination of the contents of electronic communication devices capable of accessing the internet, as well as electronic devices with storage capability (hereinafter **Target Device 1** or **TD-1** and **Target Device 2** or **TD-2**, further described below); and the extraction from **TD-1** and **TD-2** of electronically stored information further described in Attachment B hereto. Because this Affidavit is being submitted for the limited purpose of securing a warrant to search **TD-1** and **TD-2**, your affiant has set forth only the facts which your affiant believes are necessary to establish probable cause to search **TD-1** and **TD-2**.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.  The electronic communication devices to be examined are described as the following:

    a.  One black iPhone Mexican-based cellular telephone, International Mobile Equipment Identity (IMEI) 359036103557956 (**TD-1**)

    b.  One black iPhone United States-based cellular telephone, IMEI 353816084076225 (**TD-2**)

    **TD-1** and **TD-2** are currently being stored as evidence at the HSI Nogales Field Office in Rio Rico, Arizona. **TD-1** and **TD-2** are further described in Attachment A hereto.

### BACKGROUND ON SMARTPHONES

8.  Based upon your affiant's knowledge, training, and experience, as well as information related to your affiant by law enforcement officers and others experienced in the forensic examination of electronic communication devices, your affiant knows that certain types of cellular telephones referred to as "smartphones" (such as **TD-1** and **TD-2**) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, or has connected to a wireless network, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

9.  As described in Attachment B hereto, this Affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes what individual(s) used **TD-1** and **TD-2** as well as the

purpose of its use. Additionally, this Affidavit seeks information about the possible location of other evidence.

10. As described in Attachment B hereto, this Affidavit also seeks permission to search and seize certain electronic records that might be stored within **TD-1** and **TD-2**. Some of these electronic records might take the form of files, documents, or other data that are user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

11. Although some of the records requested in this affidavit might be found in the form of user-generated documents (such as electronic format documents and picture and movie files), an electronic communication device (such as **TD-1** and **TD-2**) can contain other forms of electronic evidence that are not user-generated. In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon your affiant's knowledge, training, and experience, as well as information related to your affiant by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, your affiant knows that:

   a. Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

   b. Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

   c. Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

   d. Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

   e. Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

   f. When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

   g. The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space

      where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user. All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

    h. The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

## CHARACTERISTICS OF TRANSNATIONAL CRIMINAL ORGANIZATIONS (TCO) INVOLVED IN FIREARMS/AMMUNITION TRAFFICKING

12. Based upon your affiant's experience in conducting criminal investigations of violations of federal firearms and ammunition laws, your affiant knows that firearms/ammunition-trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. These methods are common to major firearms/ammunition-trafficking organizations to varying degrees of sophistication.

13. Your affiant knows that firearm/ammunition-trafficking organizations from Mexico utilize "straw purchasers" from the United States to illegally purchase firearms and ammunition. A straw purchaser is an individual who knowingly acquires firearms or ammunition for someone who is prohibited from acquiring firearms or ammunition themselves. Firearms/ammunition-trafficking organizations typically employ and finance numerous straw purchasers to purchase firearms and ammunition from different Federal Firearms Licensees (FFLs) – which are commonly referred to as "gun stores" or "gun shops" – retail stores, and online retail websites. Straw purchasers commonly frequent gun shows, purchase large amounts of firearms and ammunition at one time, and purchase firearms and ammunition from numerous FFLs, retailers, and online ammunition distributors. A vast amount of firearms/ammunition-trafficking organizations from Mexico purchase similar firearms, which are referred to by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as "weapons of choice," and ammunition for said firearms. These firearms include semi-automatic and automatic military type rifles such as Kalashnikov-style (AK-47 type) rifles and pistols, AR-15 type rifles and pistols, Beretta 9mm Luger pistols, Colt .38 Super pistols, and FN Five-seven 5.7x28mm pistols

14. Through your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that firearms/ammunition traffickers commonly use cellular telephones to communicate with their criminal associates and co-conspirators to facilitate the commission of their smuggling offenses. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of criminal associates, call details including call history, electronic mail (e-mail) messages,

text messages and/or text message history, third party messenger application communications, and digital images of the weapons/ammunition trafficking associates and/or activity; all of which can be used to identify and locate firearms/ammunition trafficking associates, to identify methods of operation of the TCO, and to corroborate other evidence obtained during the course of the current investigation.

15. Your affiant knows that firearms/ammunition traffickers often utilize cellular telephones that are held in the name of other living or fictitious persons, and change phone numbers frequently in order to limit law enforcement officials' ability to identify and track suspects' call histories.

16. Your affiant knows that firearms/ammunition traffickers often utilize cellular telephones to store contact information of co-conspirators. Your affiant knows that this information can then be shared with other co-conspirators to assist in the flow of communication amongst the group.

17. Your affiant knows that illegal firearm and ammunition traffickers often utilize computers and electronic storage devices such as cell phones to research the price and availability of firearms and ammunition, and to acquire, pay for, and keep records of firearms and ammunition purchases. Firearms/ammunition-trafficking organizations also utilize code words for quantities and types of firearms and ammunition that are being purchased, sold, and/or transferred in effort to avoid detection by law enforcement officials.

18. Your affiant knows that illegal firearms/ammunition traffickers often utilize cell phones to share photos with co-conspirators, including photos of firearms and ammunition the TCO wants purchased. This practice is common when someone in the organization is utilizing a co-conspirator to purchase firearms or ammunition on his/her behalf.

19. Your affiant knows that firearms/ammunition traffickers utilize various individuals to make their purchases. In many instances, these purchasers are asked to travel to a city or town that they are not familiar with to make the purchase. Your affiant knows that these purchasers commonly use their cell phones to navigate to houses or stores in unfamiliar locations, and that the recovery of such addresses can benefit law enforcement in identifying unknown co-conspirators and locations.

20. Based upon your affiant's knowledge, experience, and training in firearms/ammunition-trafficking investigations, as well as the training and experience of other law enforcement officers with whom your affiant has had discussions, your affiant knows that there are certain characteristics common amongst individuals involved in firearms/ammunition trafficking. Individuals involved in firearms/ammunition trafficking activity tend to:

    a. Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted;

    b. Collect data pertaining to other co-conspirators involved in firearms/ammunition trafficking activity, including type of firearms and caliber of ammunition and quantities thereof provided, as well as monies owed and/or paid to purchase those firearms/ammunition;

c. Possess and maintain records reflecting bank transactions and/or money transfers;

d. Maintain collections of records that are in a digital or electronic format in a safe, secure and private environment, including electronic communication devices (such as **TD-1** and **TD-2**). These records are often maintained for several years and are kept in close proximity to the firearms/ammunition trafficker, usually at the individual's residence, to enable the trafficker to review the records, which are highly valued;

e. Correspond and/or meet with other firearms/ammunition-trafficking associates to share firearms/ammunition-trafficking information and/or materials;

f. Retain correspondence from other firearms/ammunition-trafficking co-conspirators relating to firearms/ammunition trafficking activity;

g. Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the firearms/ammunition-traffickers have been in contact and/or conducted firearms/ammunition-trafficking activity;

h. Use multiple telephones for communication with coordinators, scouts, couriers, straw purchasers and other firearms/ammunition-trafficking co-conspirators. Many of these phones are more commonly known as "burner phones." These "burner phones" are used almost exclusively in the commission of the firearms-ammunition crime, specifically to call other co-conspirators to discuss the arrangements, which include the purchase, pick-up and drop-off of the firearms/ammunition. "Burner phones" are used to mask or conceal the identity of the actual user/owner and to provide a way to compartmentalize the user/owner's illicit activity. These "burner phones" are usually inexpensive and are often used for a brief and/or limited time until discarded. In addition, the "burner phones" are often discarded once the user/owner suspects any law enforcement activity;

i. Use multiple telephones for communication with coordinators, scouts, couriers, straw purchasers and other firearms/ammunition-trafficking co-conspirators. On many occasions, the principal subject will also have a personal telephone in his/her possession. The personal phone will have a history of phone calls, or text messages, with other subjects involved in the firearms/ammunition-trafficking conspiracy, as the principal subject is usually introduced into the conspiracy through social contacts. These conversations will occur prior to and after the smuggling attempt. These will often be saved by the user/owner of the phone. Additionally, principles have been known to use Facebook, messaging applications or other third-party social media messaging applications (e.g., WhatsApp). The personal cell phone often will have the identities of additional co-conspirators saved in the contact log.

**PROBABLE CAUSE**

21. On May 19, 2021, Efren Alexis ROJO-German attempted to purchase a firearm (a Smith & Wesson model M&P 380 Shield EZ .380 caliber pistol) from BKM Guns Inc., dba Murphy's Gun Shop, a federally licensed firearms dealer in Tucson, Arizona. During the attempted purchase, ROJO-German completed ATF Form 4473, Firearms Transaction Record. On question 21.a of the form, ROJO-German marked the box "Yes" when answering the question: "Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you." On question 21.c of the form ROJO-German marked the box "No" when answering the question: "Have you ever been convicted in any court, including a military court, of a felony, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation?"

22. As confirmed by certified court records, on December 15, 2015, in United States District Court for the District of Arizona, case number CR14-01870-001-TUC-RCC (LAB), ROJO was convicted of Importation of Heroin in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(3), a Class C Felony offense punishable by more than one year imprisonment.

23. On June 3, 2021, HSI agents learned that ROJO was arrested by the U.S. Border Patrol (USBP) near Nogales, Arizona during a human smuggling attempt. At the time of arrest, ROJO was in possession of **TD-1** and **TD-2**. As part of the human smuggling investigation, USBP agents seized **TD-1** and **TD-2** from ROJO as evidence. HSI agents responded to the USBP Nogales Station to assist USBP agents with ROJO's custodial interview.

24. During a *post*-Miranda statement, ROJO admitted that on May 19, 2021, he traveled to an authorized firearms dealer in an attempt to purchase a pistol on behalf of an individual only known to him as "Johnny." ROJO stated Johnny resided in Nogales, Sonora, Mexico, and was not allowed to enter the U.S. due to legal matters. ROJO admitted that he knew that Johnny would be the ultimate recipient of the firearm he (ROJO) had attempted to purchase. ROJO indicated that Johnny supplies firearms to a drug trafficking organization in Nogales, Sonora, Mexico. ROJO explained that he entered into an agreement with Johnny to assist him by traveling to the U.S. to study the process of acquiring firearms in the U.S. ROJO was then to escort unidentified females to authorized firearm dealers in the U.S. to guide these females through the firearm selection and purchasing process on behalf of Johnny.

25. ROJO stated that he currently resided in Nogales, Sonora, Mexico, and that the Nogales, Arizona, address listed in his Arizona driver's license belongs to his father's place of business. HSI agents drove by this Arizona address and observed that the property consists of a dirt lot with no habitable structures and containing several inoperable cars. ROJO's Arizona driver's license lists the same Arizona address ROJO used in completing the ATF Form 4473 for his attempted firearm purchase on May 19, 2021. The form specifically asks for "Current State of Residence and Address." Based on your affiant's training and experience, TCO members involved in contraband smuggling often list inaccurate and/or

illegitimate residential addresses on driver's licenses to hinder law enforcement's ability to find them if a crime has been committed.

26. ROJO indicated he was in possession of two cellular telephones, further clarifying that he had a Mexican-based phone (**TD-1**) and a United States-based phone (**TD-2**).

27. ROJO admitted that he communicated with Johnny exclusively through the use of **TD-1**. ROJO provided HSI agents with the passcode to unlock **TD-1**. ROJO further provided limited consent to allow HSI agents to conduct a search of **TD-1**. For the reasons previously outlined in this Affidavit (specifically in paragraphs 9 through 17 herein), it is imperative for HSI agents to conduct a full analysis of **TD-1** without the limitations set forth by ROJO's limited consent. ROJO did not provide any type of consent allowing for the search of **TD-2**.

28. On June 3, 2021, HSI and ATF agents visited Murphy's Gun Shop, the firearm dealer in Tucson where ROJO attempted to purchase a firearm on May 19, 2021. Agents collected a copy of the ATF Form 4473 and all documentation related to ROJO's attempted purchase. Agents reviewed a transaction receipt which listed ROJO's contact information, including his United States-based cellular telephone number, 480-501-2834. Agents were informed by the store associate who assisted ROJO with his attempted purchase that ROJO was on his cellular telephone the majority of the time while inside the store.

29. On June 10, 2021, ROJO was charged by a Complaint in the United States District Court for the District of Arizona with Making False Statements in Connection with the Attempted Acquisition of a Firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

30. HSI agents served a subpoena to AT&T, the service provider for 480-501-2834, requesting subscriber information and toll records for the account. Information provided by AT&T in response to this subpoena revealed that ROJO was the current subscriber of the account. In addition, the information provided by AT&T identified that the account was in use by an iPhone with IMEI: 35381608407622. The IMEI listed on the SIM card tray inserted in **TD-2** is 353816084076225. Note that the last digit "5" is missing from the IMEI listed in the information from AT&T. Per the AT&T Records Key, an IMEI "can be 15 or 16 digits. A 15-digit number that uniquely identifies an individual wireless device. The first 14 digits are unique. The 15th digit is a check digit that validates the prior 14 digits." Hence, HSI agents were able to confirm that phone number 480-501-2834 was in use by **TD-2**.

31. Based on your affiant's training and experience, it would be critical for ROJO to have a United States-based cellular telephone in furtherance of weapon purchases, or such related activities, within the United States. Producing a Mexican-based phone number to an authorized firearm dealer could raise suspicion and scrutiny of the true intent behind ROJO's weapon purchase and expose the weapon's intended destination to Mexico.

32. Your affiant submits that there is probable cause to believe that **TD-1** and **TD-2** may contain evidence identifying: (1) cellular telephone numbers used by firearms/ammunition-trafficking associates; (2) telephone calls conducted with firearms/ammunition-trafficking

    co-conspirators (including time, date, and duration of calls); (3) photographs of and/or with firearms/ammunition-trafficking co-conspirators, illegal controlled substances, and/or bulk illicit currency; (4) text and/or voicemail message communications (including time and date) with firearms/ammunition-trafficking associates; (5) electronic mail and social media internet sites accessed by the user of **TD-1** and **TD-2**; and (6) usernames and/or passwords utilized by the user of **TD-1** and **TD-2** to access electronic mail and social media internet sites.

33. Based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that TCOs utilize cellular telephones (such as **TD-1** and **TD-2**) to communicate when conducting their illegal activity, using voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. These devices are utilized in furtherance of the crime via the coordination of the purchase, transportation, and distribution of the firearms/ammunition, the collection and movement of bulk illicit currency, and communication with members of the TCO about the specific operations of that TCO.

## CONCLUSION

34. Based on your affiant's training and experience, and the aforementioned facts which your affiant believes to be true, your affiant submits probable cause exists that ROJO utilized **TD-1** and **TD-2** in furtherance of weapons trafficking activities, that the above-described evidence or a portion thereof will be found within the contents of **TD-1** and **TD-2** when the requested Search Warrant is served, and that such items would constitute evidence of a conspiracy and/or attempts to illegally procure and traffic firearms into a foreign country in violation of 18 U.S.C. §§ 371, 554(a), and 922(a)(6).

35. **TD-1** and **TD-2** have been in the possession of HSI since their seizure. Due to the nature of such electronic devices, data contained within them will remain uncorrupted when being stored for long periods of time. Your affiant respectfully requests that a warrant be issued allowing for the search of said **TD-1** and **TD-2** as described above.

Further affiant sayeth not.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted this 14th day of June, 2021.

_____  Digitally signed by BRYAN DEL VILLAR
Bryan Del Villar, HSI Special Agent  Date: 2021.06.11 12:17:21 -07'00'

Sworn and subscribed telephonically before me this this 14th day of June, 2021.

_____
Honorable Lynnette C. Kimmins
United States Magistrate Judge

9

## ATTACHMENT A

The items to be searched are described below as:

a. One black iPhone Mexican-based cellular telephone, International Mobile Equipment Identity (IMEI) 359036103557956 (**TD-1**)

b. One black iPhone United States-based cellular telephone, IMEI 353816084076225 (**TD-2**)

**TD-1** and **TD-2** are currently being stored as evidence at the HSI Nogales Field Office in Rio Rico, Arizona.

21-05822MB

## ATTACHMENT B

### INFORMATION TO BE SEIZED

1. All records on **TD-1** and **TD-2** (further described in Attachment A) that relate to the violations and suspect information set forth in the Affidavit, including:

   a. Cellular information: cellular numbers, cellular service providers, caller identifications displaying sent, received, dialed and missed calls;

   b. Text information: text messages received, sent, drafted, and deleted;

   c. Photographs: photographs taken, received, sent, saved, and deleted;

   d. Videos: video recordings taken, received, sent, saved, and deleted;

   e. Audio: audio recordings taken, received, shared, sent, saved and deleted;

   f. Emails: emails sent, received, drafted, saved and deleted;

   g. Contact information: telephone contact list displaying names, addresses, telephone numbers, and deleted information;

   h. User attribution: evidence of user attribution showing who used or owned **TD-1** and **TD-2** at the time things described in this Attachment were created, edited or deleted, such as logs, phone books, saved user names and passwords, documents, and browsing history;

   i. Notes: all bank records, credit information, account information or other financial information and records;

   j. Travel information: any information recording travel arrangements during the time period set forth in the Affidavit and until the present; and

   k. Internet: records of Internet Protocol addresses used, and any records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.